Saturday, February 13th, 1813,
JUDGE ROANE,
(after stating the case) pronounced
the following opinion of the Court:
If the pleas of the appellee should even be adjudged to be bad, yet, upon the principle of going up to the first fault, judgment would still be rendered against the appellant, if, on the case made by his declaration, he has no right to recover; and it is evident that his right may be much weaker under the declaration than
under the pleas, as'the latter do not exclude (as the former does) *the idea of his having been still a citizen of this commonwealth, at the time he offered to vote. We infer this diversity, from its being stated in the declaration that the appellant was inhabiting within the district of Columbia at the time of its separation from this commonwealth; he was consequently expatriated thereby from the government of Virginia.
The act of Virginia, on the subject of expatriation, relates only to individual cases; it does not relate to those public and general acts of expatriation, by cession, or otherwise, which are more or less incident to all governments and countries. With respect to the particular cession now in question, it was contemplated and provided for by the constitution of the United States, agreed to by the commonwealth of Virginia, by its act tendering the territory to the general government, and also by the congress of the United States, who accepted the cession. To all these acts the appellant, by his representatives, was a party. He has therefore, no reason to complain that he has been cut off from the dominion of Virginia, in consideration of, perhaps, adequate advantages. That he is no longer within the jurisdiction of the commonwealth of Virginia, is manifest from this consideration, that congress are vested, by the constitution, with exclusive power of legislation over the territory in question; and it is only by the consent and courtesy of congress that any of the laws of Virginia have been permitted to operate therein. This last fact will be fully manifested by recurring to the several acts of *808 congress on the subject. It follows, that the district of Columbia being without the jurisdiction of the laws of Virginia, is, as to it, another and distinct jurisdiction, and that the appellant is not merely a citizen of Virginia, abiding, or inhabiting therein, but passed, with that territory, from the jurisdiction of this commonwealth, by the act of cession, and owes no allegiance thereto. It might well, therefore, be true, that the case made by the pleas might be in favour of the appellant, and yet that he is prohibited *from recovering, upon the weaker ground of-claim admitted by his own declaration.
With respect to the right of a citizen, or subject, of a foreign government, to inter-meddle with the civil polity of Virginia, and, especially, to exercise the all-important function of legislation, the matter cannot admit of a possible doubt. Such subjects, or citizens, cannot exercise this inestimable right, as they owe to the commonwealth no corresponding duties, and would not be amenable to the laws by them enacted. They cannot exercise this right in person, for their personal attendance may be necessary, at the same time, in their own country; and, besides, in time of war, they would be prohibited from coming here for the purpose. In some small democracies, the people have exercised the legislative power in person; and this principle is not lost sight of, when, owing to the extent of the territory, or the numbers of the people, they are compelled to exercise that power by means of deputies. This necessity of acting by agents does not change the principle; does not let in, to the appointment of such deputies, persons who, but for the necessity aforesaid, would be inhibited from acting in their primary and original character. In other words, none are competent to legislate mediately, by their representatives, but those who would be. admitted, but for the impediments aforesaid, to exercise the right in person.
It follows, from these premises, that before this great principle shall be departed from, it ought, at least, manifestly to appear, from the act of government itself, that an exception has been explicitly assented to by the people; in a case in any degree equivocal, the general principle would undoubtedly turn the scale.
There is no such exception to be found in the constitution of this commonwealth. That instrument, and the declaration of rights on which it is based, has no eye tpwards the subjects of foreign powers. It only purports to declare the rights, and settle the duties of those who *are parties to the compact. There is not only no such exception in that instrument, but, on the contrary, the converse is explicitly' declared and expressed. The declaration of rights is stated to have been made by the representatives “of the good people of Virginia;” and it is declared, “that these rights do pertain to them, and their posterity, as the basis and foundation of government.” This instrument, therefore, can never be construed to bestow the inestimable right of suffrage upon aliens and enemies, who, .have no “permanent common interest with, or attachment to,” this community; who owe paramount and conflicting duties to other sovereigns; who have superior attachments in other countries; and who, from their residence elsewhere, cannot perform duties which imply the necessity of a residence within this commonwealth. On the case made by the declaration, therefore, the appellant is, clearly, not entitled to recover.
With respect to the ground supposed to be taken by the pleas as aforesaid; while we are free to admit that it is weaker for the appellee than that made by the declaration, which admits the appellant to be no citizen, and leaves a great discretion to the officer, as to the fact of a foreign residence ; we are of opinion, that the provision of the act of 1808, in relation to it, is in consonance with the principles of the constitution. As the constitution is to be construed, as aforesaid, only in reference to our own citizens; so, such of them are not embraced by its provisions in favour of .the right of suffrage, who, through absence, are disabled from performing the duties in question; whose other. ties of allegiance, temporary or perpetual, are thrown into a scale conflicting with their duties and allegiance to this commonwealth, and whose foreign residence diminishes their former ‘ ‘common interest with, and attachment to,” this commonwealth.
Persons standing in this predicament cannot be admitted to the right of suffrage, without running counter *to all the principles on which that right is founded. As well might a resident citizen claim to vote, after he had parted with that freehold which guarantied his attachment to the community.
In thus deciding against the right of the appellant, upon the general principles just mentioned, the Court is, by no means, disposed to admit, that that result would be varied by any of the legislative provisions upon the subject. On the contrary, a recurrence to the various acts in our code, ancient and modern, will manifestly show that they are in strict conformity therewith. On every ground, therefore, the judgment of the Court below is correct, and ought to be affirmed.
In taking this view of the subject, the Court has neither considered nor decided the question, whether an action will lie against a sheriff for refusing to receive the vote of a person duly qualified; and much less has It decided, whether such action would lie against an officer, acting in obedience to a legislative act, found to be in conflict with the constitution. While this last case can rarely be expected to occur, its importance would require the most serious and deliberate consideration; and, even with respect to the first, it cannot often be expected to arise, under all the care which is taken by our constitution and laws to define, explicitly, the rights and .qualifications of the electors. Whenever either question, however, shall occur, and become necessary to be decided, the Court will not shrink from the investigation and decision thereof.
*809 APPENDIX.
JUDGE ROANE’S opinion in the case of Watkins v. Taylor and Mewburn, reported 2 Munford, 424.
[This opinion was accidentally omitted in its proper place.]
JUDGE ROANE. If one man goes to another, and obtains from him a sum of money, to be repaid at a future day, to himself, or to another, for his use, nothing more passing between the parties than a request to receive the money on one hand, and a promise to repay it on the other, this transaction would be considered as a loan of the money; and if a greater sum is reserved than is produced by the principal sum and legal interest, it would be deemed a loan interdicted by the statute of usury; and, in the absence of all other testimony on the subject, the parties would be considered to have met together for the purpose of effectuating a loan. It would not be necessary, in such case, to show that there was a lengthy treaty for a loan, but the treaty would be inferred, and receive its character from the transaction itself: in the language of the cases on this subject, “the thing would speak for itself.” This is a complete answer to the elaborate averment of the appellee, in his answer, that he had no idea of lending his money, and did not suppose that the appellant wished to borrow it. He did in fact lend the money to the appellant. These parties did not meet for the purpose of buying and selling the bonds of Heth : for, 1st. The appellant was possessed of none of those bonds; and 2dly. It is not shown that any of them were in' existence at the time, or, at least, enough of them to pay the sum contracted for ; and, besides, it is not pretended that the *appellee was himself to purchase Heth’s bonds for the sum advanced, but only that Heth himself would receive them in payment of the debt due him ; a transaction to which, whatever might be the general operation of the law on this subject, Heth was no party, and as to which the appellee was incompetent to bind him. These parties, then, having met for the purpose of borrowing and lending a sum of money, and probably under the severe pressure of the borrower, and not for that of selling bonds, the Court will look steadily at the object for which they came together, and will be astute to detect and ferret out every shift and device by which the provisions of the statute of usury might be evaded. In pursuance of this principle, however well established the doctrine may be, in this country, that bonds may be sold for less than their nominal value, considered as a distinct and insulated transaction, it is equally clear that such sale, at a great sacrifice, when combined with the loan of money, will be considered as a shift to evade the statute. The case of Gibson v. Fristoe is much stronger on this point than the present; for, in that case, there was not only a forbearance, merely, of a debt, and not a loan, in the popular sense, but also the party was possessed of the bonds of others, which he set down at an under value; and yet such sale was considered as a device to elude the statute ; whereas Heth’s bonds, in this case, were not possessed by the appellant, and were not shown to have been in the market. In that case it could have been better argued than in this, that the purpose was to sell bonds, and not to cover usury; for the party had them in possession as his property, and was, besides, treating with the very person- who was to receive them ; whereas, in this case, it is a very weak presumption, both that a person would undertake to sell what he had not, and is not shown to have existed, and that one man would undertake to make a bargain for another. This case, then, supposing the stipulation concerning the reception of Heth’s bonds to have been a part of the agreement in question, is more *'than decided for the appellant by the case of Gibson v. Fristoe : in this case, as to that, the subordinate purpose (or the accessory) must receive its character from the principal one, which was to lend money at usurious interest. But, in truth, this pretension, respecting the reception of Heth’s bonds, formed no part of the agreement. It is true it is spoken of in the bill as a part of the agreement: but, beside that the transaction (so taken) is usurious in itself, independently considered, the statute of usury is relied on by the bill, or, in other words, the transaction is declared by that part of the bill to be usurious ; and the whole bill must be taken together. The only witness who speaks on this subject is Anthony Robinson ; but his testimony falls short of the mark; he only says he thinks the lot was to be paid for in bonds, but what bonds he knew not, but rather understood that Heth’s bond would be accepted ; i. e., that there was a binding agreement to pay the sum of 1,2001., (exceeding the principal and interest of the sum received,) which he thinks might be paid in bonds, but only an understanding or expectation that Heth’s bonds would be received by Heth, who was no party to the contract. As to this expectation, were it even a part of the contract, it would not disrobe the transaction of its usurious character. The case is complete on the part of the appellant, by showing that a sum was received on loan, for which a greater sum than the law allows, was to be repaid at a future day. It then became incumbent on the appellee to justify the transaction, by not only showing an agreement, that the appellant might have delivered himself therefrom by paying Heth’s bonds, but, also, that such bonds were in the market, and that the requisite amount thereof might have been acquired for a sum not exceeding the principal and legal interest of the money borrowed. In that case, the *810 ■transaction .might possibly (but on this I give no conclusive opinion) fall within a known rule on this subject, that, where the party may relieve himself from the penalty, by paying the legal sum by a given day, the transaction *is not usurious. In respect of such circumstances, however, this case is entirely naked ; and even considering Heth’s bonds as agreed to be received in payment of the 1,2001., there is nothing to show that (if they could have purchased at all) they would not have cost their whole nominal amount; except, indeed, one bond of 3001., which is shown to have been purchased at a considerable discount, without, however, showing what that rate of discount was.
On the bill, and Robinson’s deposition, therefore, there is no pretence to say that these bonds were agreed to be received ; and, if they were, the case of Gibson v. Fristoe more than shows that, having reference to the purpose for which the parties met, the transaction respecting these bonds is, nevertheless, usurious. If a sale of bonds actually holden at the time, was infected by the unlawful purpose for which the parties met together, much more will a sale of bonds which were neither in the market, nor in existence, but, for any thing that appears, were entirely in nubibus.
The answer of the appellee, on the other hand, disclaims this pretension respecting Heth’s bonds, and sets up a new ground for justifying the transaction; namely, that the appellant had a prospect of selling his tobacco for a high price. Without stopping to inquire how far this allegation is to be regarded, in relation to its being new matter not responsive to the bill, or otherwise, it is evident it was, at most, (as well as the pretension respecting Heth’s bonds,) only an expectation of the parties; and both of them were properly admitted to be so by the appellee’s counsel. Neither of such expectations, however, can change the character of the transaction in question, more than, for example, an expectation that produce will, before the day of payment, rise to an enormous price, or that, before such day, the borrower, on a usurious contract, will succeed to an inheritance ; either of which events would, as well as the prospects now in question, *retribuie to the borrower the loss sustained by the usurious, interest.
The answer of the appellee, however, although entirely impotent in relation to the alleged prospect of selling tobacco, is very strong and clear to show the actual purpose for which the parties met together: after denying that he applied to the appellant to know how much he would take “ to bind himself to pay the 1,2001. due to Heth,” he avers that the proposal moved from the appellant to him, and was ultimately acceded to by him. What proposal ? Why, surely, a proposal “to bind himself to pay the debt . due to Heth,” in consideration of a sum to be advanced by the appellee. When we add to this, that the appellee entirely disclaims, as a part of this proposal, and, a fortiori, of his agreement, the pretension respecting Heth’s bonds, (keeping out of view, also, for the reason aforesaid, the subsequent or co-temporary expectation existing between the appellant and Heth, respecting the sale of tobacco,) what is it but a naked proposal and contract to pay 1,2001. at a future day, in consideration of 8001. then received ? I consider the contract, therefore, as clearly usurious, and am of opinion that the decree should be reversed.
Opinion of the Court in the case of Bowles v. Bingham, reported in 2Munford, 442-448.
[This opinion was delivered by Jtodqb Roane, and not by the President, and was omitted in its proper place by a mistake of the Reporter.]
This is a bill of interpleader, brought by the administrator of Harriet Bowles, a deceased infant, against the appellant, her father, and her relations, ex parte materna, of whom the wife of the appellee, Bingham, was one, spraying that the conflicting claims of these respective parties, to the estate of the said Harriet, may be settled by the decree of the Court of chancery, and the said administrator thereby enabled to make distribution of her estate. The ground stated, as well in the bill as in the answers of the maternal relations aforesaid, for excluding the right of the appellant, is, that, although the said Harriet was born after the intermarriage of the said appellant with her mother, the said appellant was not, in fact, her father ; had disclaimed her as his child ; had repudiated her mother ; and separated himself from her by articles of agreement, which are made an exhibit in the cause ; these articles, it is further alleged, were made very shortly after the birth of the said Harriet; which birth, it is, also, alleged, took place in about three months after the marriage.
Throwing out of this case the answers touching the facts aforesaid, of all the defendants, (that of Bowles only excepted,) on the ground that the answer of one defendant is incompetent to bind another, if not on the further ground that the respective defendants to a bill of interpleader may be considered, in some sense, as plaintiffs, in relation to each other, there is no evidence remaining in the cause, touching the principal question, except the answer of the appellant; for the articles of separation, while they state that that measure was produced by a convincing cause, rendering it impossible that the parties should live any longer together, do not specify what that cause was. That instrument does not bring forward, and rely on, the particular facts, on the ground of which the claim of the appellant is now opposed. As to the answer of the appellant, while it admits that he intermarried with the mother of the said Harriet, and that the said Harriet was born after the said marriage, it neither admits that her birth was at a time which, taken in relation to that of the marriage, rendered it certain that she was begotten before the marriage, nor avers that at such time he had no access to her said mother, *and far less that such access, by him, was impossible. For any thing appearing in this answer, then, the said Harriet may be considered as having been begotten, as well as born, during wedlock, and, also, at a time when non-access, on the part of the husband, has not been shown, (if pretended,) either by *811 Jiimself, or by others. As this construction, however, may be too rigid, as the appellant, perhaps, intended distinctly to admit the facts stated in the bill, showing that the said Harriet must have been begotten before the marriage, we will consider the case as if this circumstance, resulting from the respective times of the marriage, and of the birth of the said Harriet, had been particularly and distinctly admitted by his answer.
This answer admits, more particularly, that the said appellant “always insisted, that the said Harriet, though born in wedlock, was not his child.” This opinion of the appellant is entirely consistent with the idea, that he had access to her said mother, at the time of procreation, but that some ■other person, who might also have had access to her, about the same time, was, in his opinion, in reality, the father of the child ; and this opinion, so far from being bottomed upon a supposed inability of procreation, on his part, or a non-access to his wife, (which are the only grounds of exception tolerated in cases of this sort,) may have been induced either by a feverish and mnwarrantable jealousy on his part, by a belief of a simultaneous and concurrent access on the part of other men, or by other circumstances equally uncertain and equivocal. This concession, therefore, (supposing that the doctrines applying to cases of procreation during marriage, apply at least with equal force to those taking place before marriage,) will fall far short of the desideratum required in cases of the former character.
With respect to procreations during marriage, the presumption is, that all persons born during marriage are legitimate. This presumption can be destroyed only by contrary proof, demonstrating that the child is not the *child of the husband ; which, again, can only be, by showing that, from his continued absence from his wife, at or about the time of procreation, or from the impotency of his body, it is impossible that he should be the father. This presumption, in favour of legitimacy, is so strong, and the exceptions thereto are held under such strictness, that, where a man was divorced from his wife, propter perpet-uam generandi impotentiam, and then married another woman, who had issue during the marriage, that issue was holden to be his, on the ground that a man may be habilis et inhabilis diversis temporibus.(a) It is not, therefore, a mere circumstance of probability that will operate in this case to bastardize the issue. Such issue will be held to be legitimate, unless it be conclusively shown, that a person, other than the husband, must necessarily and unavoidably have been the father. This doctrine applies, a fortiori, it is believed, to cases of procreation before the marriage.
While the wise policy of our law, anxiously ■desiring that every child shall be assigned to some responsible person as his parent, for his nurture and education, and finding it necessary to act by general rules, has adopted as the rule, in this case, that “pater est quern nuptiyc; demonstrantand while, in relation to children procreated during the marriage, it only tolerates an inquiry going to show, that the husband could by no possibility have been the father of the child, it will, certainly, not relax that rule in relation to a procreation before the marriage, to cases in which the husband has entered into a matrimonial engagement with his wife, not only with a full knowledge of the rule aforesaid, but, also, (in general,) with a knowledge of her particular situation, in relation to her pregnancy, or otherwise. Our law wisely throws a veil over acts of incontinency, in such cases, and, certainly, will not, without necessity, and in a spirit of departure from a wise rule of public economy before mentioned, inundate our Courts with indecent inquiries, whether this or that man, whether the husband or another, committed a given act of immorality and fornication. It will, at *least, emphatically, interdict the husband from giving evidence in such case, for the reasons so luminously assigned, in relation to procreations during the marriage, in the case of Goodright v. Moss.(b) It is even better that a particular grievance should exist, than a scene of this sort be opened, without necessity, in a country in which public decorum is a part of its law, to contaminate and destroy the morals and peace of our country.
If, in the time of Justinian, it was deemed proper, by that emperor, to establish the age of 14 as the general age of puberty, (though it is evident that the state of puberty must vary with the particular habits and constitutions of individuals,) rather than continue the indecent usage therefore existing of judging of such puberty, in relation to each particular case, by an inspection of the habit of the body ; reasons founded on a like regard to decorum, may well be considered as having justified the general regulation we are now considering. It is no impeachment of the wisdom of the rule in either instance, or of the policy of acting by a general regulation, that particular cases may chance to occur, to which the spirit of the rule, in either case, may be inapplicable.
While, therefore, we are inclined to think that the inquiry in question is occluded on general grounds, sanctioned by principles contained as well in our own municipal code, as the codes of other enlightened nations, we are clearly of opinion, upon the particular evidence in this case, which is not only inadmissible, as aforesaid, but does not repel the possibility of the infant Harriet’s having been actually begotten by the appellant ; that the said Harriet was legitimate ; that the appellant is to be considered as her father, under the sound construction of our laws ; and, as such, is entitled to her estate, in preference to the maternal relations of the said Harriet or any other person or persons. The consequence is, that the decree of the chancellor, in favour of the maternal relations, must be reversed, and rendered in favour of the appellant, agreeably to the foregoing ideas, pursuing in other respects the provisions in the said decree contained.

 5 Co. Rep. 98, b, Burie’s Case.

 Cowp. 591.